[Cite as *Toledo v. Jones*, 2019-Ohio-237.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio/City of Toledo            Court of Appeals Nos. L-17-1220
                                                              L-18-1096
        Appellee                                              L-18-1097
                                                              L-18-1098
v.
                                        Trial Court Nos. CRB-17-02370
Joseph Jones                                             CRB-16-17507
                                                         CRB-17-02414
        Appellant                                        CRB-17-02415


**DECISION AND JUDGMENT**

Decided: January 25, 2019

* * * * *

David Toska, Chief Prosecutor, for appellee.

Adam H. Houser, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

**{¶ 1}** In this consolidated appeal, appellant, Joseph Jones, appeals from the

August 18, 2017 judgments of the Toledo Municipal Court convicting him of sexual

imposition, a violation of R.C. 2907.06(A)(1) and sentencing him to serve 60 days incarceration, which was suspended. For the reasons which follow, we affirm.

{¶ 2} Appellant appeals from the judgments of conviction and sentencing. He asserts the following assignments of error:

> A. THE TRIAL COURT ERRED IN DENYING THE CRIM.R. 29 MOTION TO DISMISS AS THERE WAS NO CORROBORATION OF THE VICTIM'S TESTIMONY IN THE TM, MW, AND AM CASES.
>
> B. THE TRIAL COURT ERRED IN DENYING THE CRIM.R. 29 MOTION TO DISMISS AND THE VERDICT OF THE JURY WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND [sic] AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHERE THE STATE FAILED TO PRESENT EVICENCE THAT "FEET" CONSTITUTE AN "EROGENOUS ZONE."

{¶ 3} Appellant was charged by separate complaints involving four victims of committing four counts of sexual imposition offensive contact, R.C. 2907.06(A)(1), a misdemeanor of the third degree. In addition, he was also charged with one count of aggravated menacing, R.C. 2903.21, involving victim No. 4 and three counts of menacing, R.C. 2903.22(A), involving the other three victims.

{¶ 4} All the cases proceeded to a jury trial on August 17, 2017. Appellant was found guilty of four counts of sexual imposition offensive contact and acquitted of the

2.

remaining charges. Appellant's sentence was stayed pending compliance with certain conditions involving mental health treatment. On August 22, 2017, at a review hearing, the trial court found appellant had complied with ordered mental health treatment and suspended the remaining imposed sentences for all four cases and placed appellant on active probation for one year and ordered that he have no contact with the victims or Franklin Park Mall. The trial court further ordered appellant to register as a sex offender.

{¶ 5} At trial the following evidence was presented. A crime analyst for the Toledo Police Department authenticated copies of appellant's Instagram, Facebook, and YouTube pictures, videos, and/or postings she downloaded to CDs. Appellant stipulated his Instagram handle was "darcangell" and his YouTube account was under "KaliforNia Kid." Portions of the CDs were played for the jury and summaries of the files were admitted into evidence to establish appellant's foot fetish and a common scheme or plan of manipulating women.

{¶ 6} Victim No. 1 testified that appellant approached her while she was shopping in a Target store on December 19, 2016, and engaged her in conversation about her shoes, which led to her placing her right foot over her left knee so he could see the insole of her shoe. Appellant immediately grabbed her heal. When she told him to stop, he said something about not being able to see inside her shoe. She was offended and pulled her foot away, moved to get away from him, and he moved to another aisle. She immediately called her fiancé and told an employee, who went back to the area with her

3.

to identify appellant and found he was talking to another woman. The employee spoke to appellant and stayed in the area. Victim No. 1 decided to check out and leave the store. She called her fiancé again while walking to her car because she was afraid appellant would approach her again. She did not report the incident until January 14, 2017, because her family had questioned why she would let this happen and whether it really happened.

{¶ 7} Victim No. 2 testified she was working at the Aldo Shoe Store at Franklin Park Mall on July 26, 2016, when appellant approached her and started a conversation about her sandals. When he asked to see it, she placed her foot on a bench because it would have taken effort to remove the sandal. Appellant immediately grabbed her foot between the sole of the shoe and the bottom on her foot and began to rub it. She was surprised and pretended to lose her balance to get away from him and go into the back room. While appellant was talking, the victim recognized he was the same man who had asked to read her palm two years earlier while she was shopping in Ann Arbor. At that time, she had allowed him to hold her hand and he made some comments about her hand that she thought were creepy and weird. After the second incident, victim No. 2 was afraid of running into appellant again. Victim No. 2 did not report the incident until February 24, 2017, because she was afraid no one would take her seriously.

{¶ 8} Victim No. 3 testified that on December 2, 2016, she was working in the PacSun store at Franklin Park Mall when appellant bumped into her, causing her to

4.

stumble. He made some comment that he must be getting bigger and was taking up too much space. She returned to her work but could see appellant continuing to look at her. He conversed with her about her shoes and asked about the brand. She lifted her foot to read the brand on the bottom. She said it was something she did not know how to pronounce when appellant dropped to his knee, grabbed her foot, pulled off her shoe, and began to caress her foot. She put her foot down and grabbed her shoe back and moved to the counter. She testified she was offended by the incident and was in shock. She talked to her manager (victim No. 4) about the incident and felt safer standing next to the manager because she was responsible for calling security. Victim No. 3 had to check appellant out and he started another conversation about not using credit cards and having his own business. He asked about a tattoo on her finger and she told him it was the earth symbol and that she and the manager had gotten them at the same time. Appellant replied that he was involved with magic and was going to start his own coven and was bringing a woman from overseas to participate in a ritual. At that point, victim No. 3 became very uncomfortable and scared. She did not file a report until February 24, 2017, when her friend, victim No. 2, filed as well.

{¶ 9} Victim No. 4 testified she was a store manager for PacSun in 2016. On December 21, 2016, appellant entered the store while she was at the counter. She greeted him as she did for all customers. Appellant began to talk to her and shook her hand so hard she told him so. He responded that he did martial arts and did not know his own

5.

strength. He started to talk about her shoes and asked to see the inside of the shoe. She was wearing shoes without a heel and quickly slipped her foot in and out of the shoe. She did not consider the conversation to be flirtatious. The conversation was interrupted by other customers who needed assistance. Appellant proceeded to shop but returned to the counter ten minutes later and asked her if victim No. 4 could point her toes. She testified she used to dance and often had people talk to her about her feet and pointing her toes, so she slipped off her shoe and pointed her toe. Appellant immediately dropped to one knee and grabbed her foot, started massaging it, and then put her toe in his mouth. She testified she never consented to him touching her and was so shocked she froze. After about 30 seconds, appellant stood up and kissed her on the cheek and told her he would be back. Victim No. 3 received a call from victim No. 4 shortly afterward and went to the store. Victim No. 3 found victim No. 4 on the floor behind the counter, shaky and upset. Victim No. 3 noticed victim No. 4 had been crying.

{¶ 10} Approximately 30-40 minutes later, at 8:55 p.m., appellant returned to the store. The two victims were standing together when victim No. 4 saw him and told victim No. 3. Victim No. 3 testified she noticed that victim No. 4 was uncomfortable and started crying. Victim No. 4 further testified that appellant approached the counter and asked if the store was closing soon but the store was closing later than normal because of the holiday hours. Because appellant had come back at what he thought was closing time, victim No. 4 became afraid appellant was going to follow her when the store closed.

6.

Appellant asked for a dressing room and another employee opened the dressing room for him to use and then called security. Security arrived as appellant was leaving the dressing room.

{¶ 11} Victim No. 4 testified that after this incident, her mother passed out flyers to other workers to warn them. She was criminally charged for doing so, but the charges were eventually resolved without a trial. Victim No. 4 denied lying to protect her mother.

{¶ 12} A Toledo police officer working at the mall off-duty testified he was called to investigate. He found victim No. 4 with some other employees and observed she looked very uneasy and frightened because she was shaking, stuttering, and had watery eyes. The officer testified victim No. 4 gave her a description of appellant, told the officer about the incident, and told him that appellant was a frequent customer. The officer further testified victim No. 4 appeared truthful and did not act like someone who consented to the encounter. The officer checked around the mall to locate appellant.

{¶ 13} At 9:00 p.m., the officer received a call that appellant had returned to the store. The officer immediately went to the store and found appellant at the back of the store. He appeared nervous because he was trembling. Based on his experience, the officer believed appellant had either done something wrong or was up to something. He did not want to give the officer his name. He eventually showed the officer his identification, but refused to answer any questions. After appellant left the store, the

officer talked to victim No. 4 a second time. She was shaking and trembling more this time because appellant had come back to the store as he said he would.

{¶ 14} In his first assignment of error, appellant argues that the trial court erred in denying appellant's Crim.R. 29 motion to dismiss. Appellant argues appellee presented no evidence to corroborate the testimonies of victims No. 1, 2, and 3.

{¶ 15} We review the trial court ruling on a Crim.R. 29(A) motion under the same standard used to determine whether the evidence was sufficient to sustain a conviction. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 39-40. Therefore, we must determine whether the evidence admitted at trial, "if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.E.2d 560 (1979). *See also State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Therefore, "[t]he verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997), citing *Jenks* at 503.

8.

**{¶ 16}** Appellee was required to prove in this case that appellant had "sexual contact with another, not the spouse of [appellant]" knowing "the sexual contact is offensive to the other person * * * or is reckless in that regard." R.C. 2907.06(A)(1). The statute further provides that "[n]o person shall be convicted of a violation of this section solely upon the victim's testimony unsupported by other evidence." R.C. 2907.06(B). Whether sufficient corroboration evidence has been admitted is a question of sufficiency for the trial court to determine. *State v. Economo*, 76 Ohio St.3d 56, 60, 666 N.E.2d 225 (1996); *State v. Bressi*, 9th Dist. Summit No. 27575, 2016-Ohio-5211, ¶ 26, citing *Economo*.

**{¶ 17}** The corroborating evidence required for this offense need only support the victim's testimony connecting the defendant to the crime and does not need to be independently sufficient to support the conviction nor go to every essential element. *Economo*. This burden is met when the testimonies of multiple victims are consistent. *State v. Manolakas*, 8th Dist. Cuyahoga No. 86815, 2006-Ohio-4263, ¶ 16 (several victims testified of a sexually-offensive work environment); *State v. Buske*, 5th Dist. Stark No. 2005CA00240, 2006-Ohio-2054, ¶ 30 (modus operandi can be establish by the similarities in the testimony of the victims).

**{¶ 18}** Appellant argues appellee only presented corroborating evidence regarding victim No. 4. Furthermore, appellant argues the corroborating evidence cannot arise out

9.

of other crimes, wrongs, or acts, but must relate to each specific instance of criminal conduct.

{¶ 19} Appellee argues the corroboration evidence was appellant's online statements and videos and the testimony of multiple victims, which reflect a common plan and scheme, which is admissible under Evid.R. 404(B). We agree.

{¶ 20} Each victim testified as to how appellant manipulated the victim into exposing her foot so he could touch it. The similarities in their testimony and appellant's on-line postings regarding how to manipulate women and his foot fetish reflect a common plan or scheme he followed to commit each crime. Such evidence is admissible for the purpose of and sufficient to act as corroborating evidence of the victims' testimonies. Therefore, we find appellant's first assignment of error not well-taken.

{¶ 21} In his second assignment of error, appellant argues that the trial court erred in denying his motion to dismiss and his conviction was not supported by sufficient evidence because feet do not constitute an "erogenous zone" under R.C. 2907.01(B). Appellant also challenges that his convictions were contrary to the manifest weight of the evidence.

{¶ 22} R.C. 2907.01(B) defines "sexual contact" as: "any touching of an erogenous zone of another, * * * for the purpose of sexually arousing or gratifying either person." Furthermore, "in the absence of direct testimony regarding sexual arousal or gratification, the trier of fact may infer a purpose of sexual arousal or gratification from

10.

the 'type, nature and circumstances of the contact, along with the personality of the defendant.'" *State v. Franklin*, 9th Dist. Wayne No. 2014 CRC-1 000031, 2016-Ohio-56, ¶ 13, quoting *State v. Antoline*, 9th Dist. Lorain No. 02CA008100, 2003-Ohio-1130, ¶ 64, quoting *State v. Cobb*, 81 Ohio App.3d 179, 185, 610 N.E.2d 1009 (9th Dist.1991). *See also State v. Edwards*, 8th Dist. Cuyahoga No. 81351, 2003-Ohio-998, ¶ 21-22; *State v. Johnson*, 1st Dist. Hamilton No. C-150723, 2016 Ohio App. LEXIS 4192, *3 (Oct. 14, 2016).

**{¶ 23}** In the case before us, the jury could infer from the testimony of the victims and appellant's social media postings that he has a foot fetish and touching of the victims' feet was motivated by a desire for sexual arousal or gratification. Therefore, there was sufficient evidence to present the case to the jury.

**{¶ 24}** A challenge to the weight of the evidence questions whether or not the greater amount of credible evidence was admitted to support the findings of fact. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17; *Thompkins*, 78 Ohio St. 3d at 387, 678 N.E.2d 541. When weighing the evidence, the court of appeals must consider whether the evidence in a case is conflicting or where reasonable minds might differ as to the inferences to be drawn from it, consider the weight of the evidence, and consider the credibility of the witnesses to determine if "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed

11.

and a new trial ordered." *Id.* quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 25} Upon a review of all of the evidence, we cannot find the jury lost its way in evaluating the evidence, determining the credibility of the witnesses, and drawing inferences from the evidence. Therefore, we find that appellant's convictions are not contrary to the manifest weight of the evidence.

{¶ 26} Therefore, we find appellant's second assignment of error not well-taken.

{¶ 27} Having found that the trial court did not commit error prejudicial to appellant and that substantial justice has been done, the judgments of the Toledo Municipal Court are affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgments affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.                         _____
                                                             JUDGE

Arlene Singer, J.

                                            _____
Thomas J. Osowik, J.                                   JUDGE
CONCUR.

                                            _____
                                            JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.